1. The evidence as to whether the plaintiff had sufficient mental capacity to execute the power of attorney was in conflict, but there was abundant testimony to authorize the finding that such capacity existed.
2. While the power of attorney which was in evidence authorized the execution of an absolute deed of conveyance or of a security deed if necessary and proper in the management of the plaintiff's property, it in no wise empowered the attorney in fact, a brother-in-law of the plaintiff, to execute to his brother, another brother-in-law of the plaintiff, for the benefit of themselves and their family, an absolute conveyance of the remainder interest in the property after the death of the plaintiff, as a substantially gratuitous disposition of the property without regard to its value, as the attorney in fact testified in effect was done. Accordingly the verdict, which in effect established such deeds, executed under the power of attorney, as absolute conveyances of the remainder interest in the property, was unauthorized by the evidence.
3. The record fails to disclose any evidence which would implicate the defendant grantee in the deeds from the attorney in fact in any fraud upon the plaintiff, other than what might be inferred from the gross discrepancy between the moneys advanced by the grantee and the value of the remainder interest in the property. But such discrepancy would be immaterial, since, even though the answer of the grantee set up a purchase of the remainder interest, his testimony, admitted without objection, went only to show that the advances made by him were in the nature of a loan, which was secured by the deeds, and for which he expected repayment at the death of the grantor. Accordingly, if the evidence on another trial should be admitted without objection on the defendant's answer as it now stands, and should be in substantial accord with that at the last trial, the grantee, upon a cancellation of the deeds as prayed, would be entitled to receive the sums advanced by him with interest, as asked for in the alternative prayer of his answer. As to the restitution of moneys received by a grantor from a grantee of a deed sought to be canceled, see Dean v. Goings, 184 Ga. 698 (2, 3) (192 S.E. 826), and cit.; Walker v. Walker, 139 Ga. 547 (7, c) (77 S.E. 795); Hooper v. Weathers, 175 Ga. 133, 135 (165 S.E. 52), and cit.; Cooper v. Peevy, 185 Ga. 805, 808 (196 S.E. 705), and cit.; Code, § 20-906. See also Franklin Savings Loan Co.
v. Branan, 54 Ga. App. 363 (2), 364 (188 S.E. 67). *Page 265 
4. So far as the cancellation of the power of attorney is concerned, the same, not being coupled with an interest, was revocable at will; and the mere filing of the suit amounted to a revocation thereof with respect to any future action thereunder by the attorney in fact.
5. The foregoing rulings control the case as tried, without reference to the special grounds of the motion for new trial. But since another trial must be had, it is held that the power of attorney was admissible for the purpose stated in division 2 of this syllabus; and that the remaining special grounds are without merit.
Judgment reversed. All the Justicesconcur.
 No. 13195. MAY 17, 1940.
Ida Hammond Thompson, seventy-two years of age, by next friend, filed a petition against Zuett Thompson, her brother-in-law, and Frank Thompson, also a brother-in-law, brother of Zuett Thompson, to cancel a power of attorney, which she had executed to Zuett Thompson, and two deeds, which the latter as attorney in fact had executed to Frank Thompson, conveying the remainder interest of the plaintiff, after her death, in two city lots and in eighty acres of farm property. The petition alleged, that, on account of a previous stroke of paralysis and impairment of her faculties, the plaintiff could not read and was unable to understand the nature and consequence of her act in signing the power of attorney; that Zuett Thompson represented to her that it was merely a paper to enable him to borrow money for her at the bank in order to pay off a paving debt on the property, which she would lose unless paid; that this defendant and Frank Thompson colluded to obtain title to her property by the execution of the deeds for a purported consideration of $125 for each deed, whereas the value of the remainder interest was $1500 for each of the two groups of property conveyed by the instruments; that Frank Thompson knew as to the plaintiff's condition and as to the alleged fraud when he took the deeds; that there existed an understanding between the two brothers that Frank Thompson should hold the legal title until the death of the plaintiff, and the defendants would then divide the property; and that the power of attorney was insufficient to authorize the sale or the execution of the deeds in question. Both defendants in their answers denied all averments of fraud. Frank Thompson set up an absolute purchase of the remainder interest in the property in good faith and for an adequate consideration of *Page 266 
$250, which he had "expended for purchase-price," and he prayed a recovery of that sum with seven per cent. interest, "if the jury . . should see fit to cancel said deed." Zuett Thompson set up that he had paid out $115.62 for paving assessments and $114.62 for groceries, for which he also prayed a recovery, if the jury should find in favor of a cancellation of the deeds. The material parts of the power of attorney from the plaintiff were as follows: "That I, Ida Hammond Thompson, have constituted, made, and appointed . . Zuett Thompson . . my true and lawful attorney in fact, for me and in my name, place, and stead to represent me generally in my business affairs, giving and granting unto my said attorney full and complete power in and about the premises. . . This is intended as a general power of attorney to handle all of my property and to do any and all things necessary in connection therewith, including the right and authority to make any and all deeds and conveyances should any of my property be disposed of."
The jury found for the defendants on the issues submitted by the court's charge, as to whether the plaintiff had sufficient mental capacity to execute the power of attorney, and as to whether that instrument and the deeds were executed as the result of fraud practiced upon her.
On the question of mental capacity the plaintiff testified in the trial, the record indicating that she was unable to talk intelligibly, and that her answers to questions were given by nodding or shaking her head. She denied her understanding or ability to understand the power of attorney, or that she had any intention thereby to give a power to sell her lands. As to her mentality, a physician testified that she had a stroke of apoplexy, paralyzing her throat and preventing her from talking, about a year before the transaction, and another stroke just before the transaction, rendering her "emotionally unstable," unable to move or talk, retarding her mental faculties and ability to reason; and gave his opinion that she would not have had the mental ability to understand the paper. Another physician testified to similar effect. Other non-expert witnesses, who had seen the plaintiff, gave their opinions as to her lack of mental capacity to understand the transaction or execute the instrument. On the other hand, there was testimony for the defendants, going to show the intelligence of the plaintiff and her *Page 267 
mental capacity to execute the power of attorney, and as to the reading of it to her several times and her understanding of the contents before it was signed. On the question of fraud, the plaintiff testified that she was unable to read the power of attorney and did not know and could not understand its contents, and did not understand that she was giving to Zuett Thompson authority to sell her lands. One of the defendants' attorneys testified that he had discussed with the plaintiff what she desired done with reference to her property; that she wanted some one to look after her business, take charge of her property, and be given full authority, but he did not "remember that she said anything about selling her property," and he "did not discuss with her at all the selling of the property," but he told her that under a general power of attorney the attorney in fact could "do anything that she could do." There was testimony for the plaintiff as to the value of the properties conveyed by the two deeds, the consideration stated in each of which was $125, that the eighty acres of farm property, in which the plaintiff owned one third or larger interest, conveyed by one of the deeds, was worth about $5000; and that the two houses and lots in Marietta, which were conveyed by the other deed, were worth $1250 to $1500.
Zuett Thompson, testified, without objection, that when the plaintiff sent for him she told him "she thought the best thing to do was to dispose of all of her property and turn it back to the Thompsons; and I says, `What do you mean by the Thompsons?' and she says, `You and Frank,' and I says, `Well, Ida, there will have to be something done before you can turn it back to the Thompsons;' and she says, `What do you mean by that?' and I says, `You have got to give me written authority;'" that her finances were bad, paving assessments were due and had to be attended to, and she needed additional money; that she requested him to send for the attorney to prepare a power of attorney. Also, that after being unable to arrange the paving assessments he went to his brother, the other defendant, executed the deeds to him, and received $250; that "she wanted me to pay off those [paving] notes, and turn the property over to the Thompsons;" that "she wanted the property to be returned to the Thompson family, and it taken the $250 to get it straightened out so I could turn it back to the Thompson family. I got that $250 in order to enable me to turn *Page 268 
the property back to the Thompson family." He further stated: "As to whether I knew that the value of that land out there was three or four thousand dollars — well, the value of it wasn't in it at all. I was selling a half interest in that piece of property worth five or six thousand dollars for $125, because she wanted to turn it over to the Thompson family. I was selling it and undertaking to turn it over to my brother and the other Thompson children; that was what I was undertaking to do, and that was what she said do. I fixed it just as she said fix it; she made it out to leave to us all. I carried out what she wanted done. The deeds read as to what was to become of it. . . She didn't say what name the deed was to be made to, only to the Thompsons; she wanted her property to be turned back to the Thompsons. . . And as to whether I understood at the time the deeds was made that if Ida Thompson died, my brother would make a deed back to me and all the balance of those heirs — no, there wasn't no understanding about that. I told you a while ago that I was undertaking to do what she said do, and the deeds speak for themselves." He further testified, as to the $250 paid by his brother, that he had expended the money substantially as stated in his answer.
Frank Thompson testified, that he paid the $250 in cash; that "Zuett come to me and he says, `Frank, we have got to have some money; won't you let us have some money?' And I told him, `Yes,' and he told me how much, and I told him, `Yes.' I didn't have him to make me a deed to secure that money I let him have. I gave him the money, and he brought me this back. As to whether or not it was understood between me and Zuett that when Ida died this property would all be sold, and we would then divide it up among the Thompson heirs, — well, I don't get anything out of it at all until after her death, and their names isn't on these deeds; it is my name. That wasn't the agreement between me and him; we didn't make any agreement. He wanted the money, and I told him he could get it, and I gave it to him. I put the $125 on these two houses over there, and $125 on the farm down here. I divided it up that way because there was different pieces of it, and I wanted something to cover both places with a deed. These two deeds were given to secure me in the $250 that I advanced him. . . When Zuett spoke to me about that money, I let him have it right at once, and I told him if he wanted any more he could get it. And *Page 269 
another thing, I promised him if she died I would give her a burial of $150 to $200. I was to pay her burial expenses up to $200. As to when they were to pay me back that $250, I don't get it back until after her death. As to whether I am to get it back then or not — well, the deeds shows that." There was no evidence as to any other participation by Frank Thompson in the transaction, or as to his knowledge of any fact relating to the execution of the power of attorney.
In addition to the general grounds of the motion for new trial, the plaintiff excepted to the admission in evidence of the power of attorney, on the ground that it did not authorize the making of the deeds in question, or authorize any sale of the land. Also, to the refusal of a request to instruct the jury that "the power of attorney in evidence in this case is insufficient to authorize the sale of any property, or to authorize the sale of a remainder interest in the property described in the two deeds which are also in evidence." Also, to the admission, over objection that it was irrelevant and prejudicial, of testimony by a nephew of the defendants, to the same effect as the above-quoted testimony by the defendant attorney in fact, that the plaintiff desired her paving indebtedness paid "because she wanted this place to go back to the Thompson estate;" and, over similar grounds of objection, of testimony from the plaintiff that before the execution of the power of attorney she had given to the defendant attorney in fact a watch and chain which had belonged to her deceased husband. As to the first-stated evidence the court, in overruling, the objection, expressly admitted it only "to shed whatever light it may upon the question of [the plaintiff's] mental capacity." The plaintiff excepted also to the instructions relative to fraud, on the grounds that they were not adjusted to the pleadings, charged the law relating to normal persons of sound mind without any controlling mind over the person executing the instrument; and that, having charged on the question of fraud, it was necessary to charge the jury fully on that subject. The instructions stated in effect the abstract rules of the Code, including § 37-710, relating to "great inadequacy of consideration joined with great disparity of mental ability," as justifying the setting aside of a sale or contract. There was no request to charge on the subject of fraud, mental capacity, or undue influence. *Page 270